33 C.C.P.A.(Patents)

**Application of AYERS.**
**Patent Appeal No. 5107.**

Court of Customs and Patent Appeals.

March 6, 1946.

Hammond & Littell, of New York City (Albert C. Johnston, of New York City, of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the Board of Appeals of the United States Patent Office affirming the Primary Examiner's final rejection of one of the claims (No. 22) of appellant's application, serial No. 278,027, for patent on a process of producing iron oxide.

Eleven claims stand allowed. It is said in the brief of the solicitor for the Patent Office that these "define the process more specifically than claim 22."

The rejected claim reads:

"22. In a process of producing red iron oxide by the decomposition of ferrous sulfate containing manganese sulfate as a contaminant, the steps which comprise heating dehydrated ferrous sulfate out of direct contact with flame or combustion gases in a substantially closed heating zone to predetermined maximum temperatures above 1300°F. but not exceeding 1550°F. adapted to cause conversion of ferrous sulfate into iron oxide of predetermined quality, supplying air to the decomposing material in an amount sufficient to support the reaction

$$2FeSO_4H_2O + 1/2\ O_2 = Fe_2O_3 + 2SO_3 + 2H_2O,$$

and restricting the supply of air so that the gases within the heating zone contain at least about 10% of combined sulfur trioxide and sulfur dioxide."

The references relied upon as listed in the statement of the examiner and in the decision of the board are:

Phelps et al., 267,582, Nov. 14, 1882
Neill (British), 230,774, Oct. 5, 1925

Thorpe, "Dictionary of Applied Chemistry," New and Revised edition, (1916), Volume 5, pages 327 and 328. Longman's London.

It is noted that in the examiner's statement the last named reference is "cited for convenience only."

Some other references are referred to in appellant's reasons of appeal but since they are neither cited nor referred to in the official decisions they need not be listed here.

Three decisions of the board are of record, two of them being upon requests for reconsideration. The record also contains many of the arguments made before the tribunals of the Patent Office during the prosecution of the application upon all the matters argued before us. So, it is obvious that the technical features of the claim here involved received full and careful consideration by the Patent Office experts.

An affidavit of the inventor purporting to state certain facts was filed *after* the examiner's statement had been forwarded to the board in connection with the appeal. It does not appear ever to have been before the examiner for consideration. There was no remand of the case to him under Patent Office rule 138 nor, so far as the record discloses, was any such remand requested by appellant. Under such circumstances the board, as is set forth in that rule, was not at liberty to consider it. Therefore, appellant's reason of appeal No. 10 (the matter is also referred to in reason of appeal No. 12), alleging that the board "erred in disregarding the facts shown" therein is without merit. Obviously, the affidavit is not properly before us for consideration.

The product which appellant obtains by his process—iron oxide (the appealed claim designates "red iron oxide"), seemingly in the form of pigments—is stated to be substantially pure ferric oxide, the chemical formula of which, according to his brief, is $Fe_2O_3$, used to "color paint, rubber, linoleum and the like." (The use of such oxide for those purposes is old in the art.)

The brief for appellant states (record page references being omitted):

"Ayres discovered and disclosed that by heating dehydrated ferrous sulfate contaminated with manganese sulfate indirectly in a closed system to temperatures between

1300° and 1550°F., while supplying enough air for direct oxidation of the ferrous sulfate by the stated reaction but restricting the air supply to keep at least 10% of sulfur oxides in the reaction gases, there is achieved a high rate of conversion of ferrous sulfate to iron oxide without appreciable conversion of the manganese sulfate, although decomposition of both sulfates normally would occur at these temperatures * * *; and conversion proceeds at maximum thermal efficiency with lowered heat requirements (i.e., B.T.U. input), by reason of the oxygen supply and the reaction induced * * *; and the color brightness of the product is enhanced and its manganese oxide content is held low, despite the tendency of air to produce opposite effects, by reason of the relatively high concentration of sulfur oxides held in the reaction atmosphere and its influence upon the decomposing solids * * *."

As outlined in the appealed claim appellant, in producing red iron oxide, decomposes ferrous sulfate containing manganese sulfate "as a contaminant." He (1) heats dehydrated ferrous sulfate in a "substantially closed" heating zone; (2) heats it to "predetermined maximum temperatures above 1300°F., but not exceeding 1550°F."; (3) supplies air to the decomposing material "in an amount sufficient to support the reaction" prescribed by the formula set forth in the claim, and (4) restricts the supply of air, "so that the gases within the heating zone contain at least about 10%' of combined sulfur trioxide and sulfur dioxide."

The pertinent disclosures of the patent references are tersely stated in the brief of the Solicitor for the Patent Office as follows:

"The patent to Phelps, et al., No. 267,582 * * * discloses a process in which iron sulfate is heated in a closed retort under controlled air admission, to a temperature which may be 'as high as a cherry-red heat —say 1,300°F.' to effect a conversion to iron oxide.

"The British patent to Neill * * * discloses a process of producing iron oxide from iron sulfate which comprises dehydrating the sulfate and heating to convert it to oxide. The patent states that the sulfur oxides in the gases should not exceed 'about 8 percent.'"

With respect to the Thorpe reference the board said:

"The citation from Thorpe's Chemical Dictionary is apparently intended by the examiner merely to disclose the conception or desirability of having concentration of sulfur oxides in any gas from which it is to be recovered, as high as possible. This would seem to be merely an elementary feature obvious to many chemists in the absence of reasons to the contrary."

One feature stressed by appellant is the presence of "manganese sulfate" in the ferrous sulfate being decomposed. This appears in the introductory, or preamble, clause of the claim. It was emphasized before the board, particularly in appellant's second request for rehearing, and was discussed and passed upon in the board's decision on that request.

The Phelps et al. patent discloses the production of iron oxide by decomposing ferrous sulfate derived from pickle-liquor, but it does not mention manganese sulfate as a constituent of the ferrous sulfate.

Concerning this, the examiner, who passed upon claim 22, asserted that "Manganese sulfate is very likely to be present in any solution obtained in pickling steel or iron, since this is a common ingredient of steel and iron of commerce" and the board approved the statement saying in its decision on the second request for rehearing (after pointing out that manganese sulfate appears in the preamble and is not required in the "positive or definite steps of the claim"):

"* * * practically all iron or steel contains some manganese and even a trace of it in the pickling liquor would satisfy claim 22."

Appellant did not call for an affidavit in support of the assertion of fact made by the examiner, as he was entitled to do under Patent Office rule 66, 35 U.S.C.A. Appendix, and we regard the findings so made as binding on us.

Appellant alleges, in effect, that the material used by Phelps et al. is not dehydrated. It appears that the patent does not use the term "dehydrated," but it does recite "evaporating the pickle-liquor drying the resulting crystals of sulphate of iron in the usual well-known ways * * *," which, obviously, means getting water out of it, or dehydrating. Appellant's application refers to "drying and dehydrating," but no particular degree of drying or dehydrating is shown nor is there any satisfactory showing of criticalness concerning it.

A further contention of appellant is to the effect that the degrees of temperature "above 1300°F. but not exceeding 1500°F.," to which the material is heated are critical. Both are described as "predetermined maximum temperatures." It is observed that the specification recites the temperatures as "between 1300 and 1550°F."

The Phelps et al. patent shows heating to a high degree, sometimes "as high as a cherry-red heat—1,300° Fahrenheit."

We are not convinced that the record sustains appellant's contention of the criticalness of this feature.

The latter portion of the claim relates to the regulation of the air supply and seems to embrace minimum and maximum limits.

The minimum limit, which we consider first, is expressed in the claim as "in an amount sufficient" to support the reaction defined in the formula.

Appellant's brief states:

"(a) The minimum will furnish at least ½ mol. of oxygen for reaction with every 2 mols. of dehydrated ferrous sulfate treated."

While we have no reason to doubt the accuracy of the last quoted statement (it was set out in substance in the specification), it is not a part of the claim and we may not read it into the claim as a limitation, and the expression "in an amount sufficient" seems to us to have been correctly characterized by the examiner as "indefinite and meaningless in view of the fact that applicant does not propose to oxidize all the ferrous sulfate, but leaves some [page reference omitted] to be dissolved out of the product."

The last feature, or final limitation, of the claim relates to the restriction of the air supply for the purpose described. This is treated in appellant's brief as the maximum limit of air control.

The brief states:

"(b) The maximum will keep at least 10% of sulfur oxides in the reaction gases."

The precise phraseology of the limitation under consideration is "restricting the supply of air so that the gases within the heating zone contain *at least about 10%* of combined sulfur trioxide and sulfur dioxide." (Italics supplied.)

The Neill process patent, in which air is used for the same purpose that appellant uses it, teaches that the concentration of sulphur dioxide and trioxide given off during the conversion should not exceed *about 8%.*

The term "about" as used in the patent and in the appealed claim evidently permits of some tolerance and the use of the words "at least" before "about" in the claim does not seem to us to be a modification critical in character.

We are not convinced of error in the board's decision and it is, therefore, affirmed.

Affirmed.