38 C.C.P.A. (Patents)

## Application of DE VANEY.
### Patent Appeal No. 5722.

United States Court of Customs and
Patent Appeals.

Dec. 5, 1950.

———————

Pierce, Scheffler & Parker, Washington, D.C. (Ralph E. Parker, Washington, D.C., of counsel), for appellant.

E. L. Reynolds, Washington, D.C. (J. Schimmel, Washington, D.C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of all the claims—three in number—embraced in appellant's application for patent relating to alleged improvements in the beneficiation of silicious iron-bearing minerals by cationic froth flotation processes. It is understood that by "beneficiation" as used in mineral art concentration of the ore is meant.

The claims read:

"6. Process of concentrating the oxidic iron content of an aqueous pulp of a silicious, essentially non-magnetic oxidic iron-bearing material by froth flotation, which comprises adding to the aqueous pulp an alkali in an amount sufficient to alkalize the pulp to a pH of from about 8 to about 10, subjecting the pulp at such alkalinity to froth flotative treatment using a frother and a cationically-acting amine collector consisting predominantly of a water-soluble form of a primary aliphatic amine having an aliphatic chain corresponding in length to that of a coconut oil fatty acid, and recovering a concentrate of oxidic iron from the underflow.

"9. Process of concentrating the oxidic iron content of an aqueous pulp of a silicious, essentially non-magnetic oxidic iron-bearing material by froth flotation, which comprises adding to the aqueous pulp an alkaline-acting alkali metal compound in an amount sufficient to alkalize the pulp to a pH of from about 8 to about 10, subjecting the pulp at such alkalinity to froth flotative treatment using a frother and as a cationic collector a water-soluble derivative of primary dodecylamine, and recovering a concentrate of oxidic iron from the underflow.

"10. Process of concentrating the oxidic iron content of an aqueous pulp of a silicious, essentially non-magnetic taconite by froth flotation, which comprises adding to the aqueous pulp an alkaline-acting alkali metal compound in an amount sufficient to alkalize the pulp to a pH in excess of 8, subjecting the pulp at such alkalinity to froth flotative treatment using a frother and a cationically-acting amine collector consisting predominantly of a water-soluble form of a primary aliphatic amine having an aliphatic chain corresponding in length to that of a coconut oil fatty acid, and recovering a concentrate of oxidic iron from the underflow."

The references consist of three patents and two publications, cited in the brief of the Solicitor for the Patent Office in the following arrangement:

"Lenher, 2,132,902, Oct. 11, 1938;
Harris, 2,177,985, Oct. 31, 1939;
Trotter et al., 2,205,503, June 25, 1940;
    Bureau of Mines R. I. 3333, pages 13–20,
    Arbiter—'Collection of Metals by Amines' Tech. Paper No. 1581—pp. 7, 8."

In the brief for appellant it is pointed out that claim 6 (which the board quoted as illustrative) is broader than claim 9 (which the brief quotes as representative) "in the respect that the cationic collector may be any 'water-soluble form of a primary aliphatic amine having an aliphatic chain corresponding in length to that of a coconut oil fatty acid'," and that claim 10 "is limited to a treatment of 'essentially non-magnetic taconite' * * * and calls for maintenance of 'a pH in excess of 8' in the pulp circuit." The brief describes the taconite so referred to as "a particular ferruginous chert found in great quantities in northern Minnesota and elsewhere."

There is no contention before us, nor was there any below, that there is any limitation in any claim which distinguishes it patentably from any other claim. Therefore, as is suggested in the brief of the Solicitor for the Patent Office, all three claims stand or fall together.

In the brief for appellant it is said, in substance, that the claims are limited to what is asserted to be his "specific contribution to the art of cationic froth-flotative beneficiation," to wit: "* * * in the case of beneficiating oxidic (specifically, hematitic) iron ore materials, using higher primary (or mixed primary-secondary) aliphatic amines as the collectors, the pulp circuit should be *distinctly* alkaline (pH 8 or higher). His researches brought out the additional fact that there is a relationship between the optimum alkalinity and the length of the alkyl chain of the alphatic amine collector: 'the longer the chain the higher should be the alkalinity, *with a pH of about 10 as maximum*' * * *." (Italics quoted.)

A somewhat less technical description is given in the decision of the board as follows: "The subject matter of the claims under consideration is a process for concentrating non-magnetic oxidized iron ores by froth flotation in which a cationically-acting amine collector, consisting predominantly of a water soluble form of a primary aliphatic amine having an aliphatic chain corresponding in length to that of a coconut oil fatty acid, is used as frother, and the pulp is alkalized to a pH of from about 8 to about 10."

All the claims were rejected by the Primary Examiner as lacking invention over the patent to Lenher taken in view of the other references. Concerning the Lenher reference he said, *inter alia:* "The patent to Lenher is the basic patent on the froth flotation of acidic ore with the 'so called cationic reagents'. This patent discloses *that acidic or negative charge constituents of ores may be floated with amines or quaternary ammonium compounds.*"

The brief for appellant states: "This [the Lenher] patent * * * is understood to be the first disclosure—or among the first disclosures—of cationic froth flotation. * * *"

The cationic process differs materially from what is known as the anionic froth flotation process which latter, so far as we can discern from the record, was the only process in use prior to the development of the cationic process.[1]

---

1. The brief for appellant recites certain historical matter, which furnishes an interesting background for study of the case. It reads:

"Prior to about 1937, a great deal had been learned as to the beneficiation of ore materials in general by what is known as the anionic froth flotation process, wherein ore particles bearing a *positive* charge are induced to float (and be collected in the froth) while the silicious or *negatively* charged particles of the pulp are not floated but remain in the underflow. This anionic froth flotation process had come into large-scale industrial use for the beneficiation of various ores, e. g., copper ores and gold ores. (Italics quoted.)

"However, the anionic method was found to have very definite limitations

In the brief for appellant, after some analysis of the references, it is said (in the course of its argument as to the non-applicability of the Lenher patent as a reference): "It should be noted that appellant does not claim invention in the use of aliphatic amines as cationic collectors: Lenher made that important discovery. Nor is appellant claiming invention in the concept of floating silica from iron oxide broadly: that is the subject matter of his application Serial No. 500,002 (Record, p. 85 et seq.). *What he here claims as patentable invention is the improved method involving making the pulp circuit distinctly alkaline—pH of 8 to 10—in floating silica away from non-magnetic iron oxide when using an aliphatic amine as the cationic collector.*" (Italics ours.)

So, in the final analysis, the ultimate issue presented is relatively narrow, having to do primarily with the pH range of the pulp referred to in the claims.

The brief for appellant before us contains what is termed a "Glossary" (which, it may be said, conforms to standard chemical publications) in which pH is defined as follows: " 'pH': hydrogen ion concentration or 'hydrogen potential'; a measure of the acidity or alkalinity of an electrolyte. Hydrogen ion concentrations vary between 1 (for strongly acidic) through 7 (for the neutrality point) to 14 (for strongly alkaline) electrolytes. A pH of between 6 and 7 means very weakly acidic; a pH of between 7 and 8 means very weakly alkaline."

There is before us, as there was before the board, a question respecting the teaching of Lenher relative to the matter of pH range.

In its decision the board quoted from the brief of appellant before it (which is not included in the record before us except as so quoted) appellant's description of the Lenher teaching, stating that with the exception of one assertion it considered such description fair and accurate.

The matter quoted in the board's decision follows immediately the matter quoted in the footnote, *supra*. It reads:

"When the Lenher patent No. 2,132,902 issued, in October of 1938, the art was informed of a distinctly different method of froth flotation, viz., the so-called 'cationic' froth flotation process, wherein mineral particles bearing a *negative* charge are induced selectively to float (and be collected in the froth) while the *positively* charged particles of the pulp tend not to float but rather to remain in the underflow. Lenher taught to use, as the reagent for effecting this type of separation, an organic compound 'the surface active portion of which is a positive ion'. That is to say, patentee taught that to raise negatively charged particles into the froth there should be used a reagent having a net positive charge. Patentee named many positively charged compounds including quaternary ammonium compounds and higher aliphatic amines, such for example as dodecylamine, in their water-soluble forms. (Italics quoted.)

"He illustrated this concept by using positively charged collectors (particularly certain quaternary ammonium compounds) for floating feldspar (examples 1 and 2) from positively charged gangue particles and ilmenite (example 3) from garnet, and stated that other negatively charged ores such as 'quartz; ilmenite; the pyroxenes; the spinels such as picotite and magnetite; the micas such as biotite and muscovite'; could be similarly froth-flotatively beneficiated using reagents having a net positive charge. Lenher taught that in effecting the cationic process the pulp circuit should be maintained neutral (i.e., pH 7.0)."

and weaknesses. The reagents were frequently quite inefficient and resulted in low yields of inferior concentrates. Because of the poor efficiency, the froth flotation of many ores was considered industrially impossible. Particularly in the case of iron ore materials—where the relatively very low cost of the beneficiated product made it economically impossible to add a substantial process-ing cost—it had been found that the anionic froth flotation process, as then known, was not economically feasible because (1) it required the use of relatively very large amounts of the conventional anionically-acting flotation reagents, and (2) it effected a less than desirably sharp separation between iron ore particles and silicious gangue particles."

The board took exception to the last sentence, reading: "Lenher taught that in effecting the cationic process the pulp circuit should be maintained neutral (i.e., pH 7.0)", declaring "we find no general directions in this patent to this effect." This holding is specifically assigned as error in appellant's reasons of appeal to us.

Appellant's brief before us (we assume for purposes of emphasis) is quite repetitious and for that reason we have experienced some difficulty in considering the arguments on his behalf in logical order.

However, it is clear that throughout the brief emphasis is now being placed upon the limitation or restriction to the treatment, by the method defined in the claims, of *non-magnetic* iron oxide. In claims 6 and 9 the material treated is defined as "silicious, essentially *non-magnetic* oxidic iron bearing material" (which in the brief is said to be hematite), and in claim 10 it is defined as a "silicious, essentially *non-magnetic* taconite." (Italics ours.)

Appellant contends that the Lenher patent "does not mention or teach the cationic froth flotation process of any *non-magnetic* oxidic iron ore material." (Italics ours.) In other words, we understand appellant's contention to be that Lenher's treatment, so far as the iron oxide material is concerned, is confined to magnetic iron oxide (i.e. magnetite).

In the statement of the Primary Examiner it was distinctly averred: "The recitation of the particular class of ores, and of the limited pH concentration and of the particular reagent *is not in accordance with the original specification* which is more generic as to each of these details." (Italics ours.)

We do not find the accuracy of that statement specifically challenged in the assignments of error accompanying appellant's appeal to the board, but from the reply of the Primary Examiner to appellant's brief before the board we assume it may have been argued therein in some manner, because the reply three times refers to the assertion relating to the class of ores not being in accordance with the original specification, saying at one place, "The emphasis

on non-magnetic iron oxide in the Brief is not supported by the original disclosure"; at another place, "The applicant's argument overlooks again * * * that the applicant's original specification nowhere mentioned any difference between magnetic and non-magnetic iron ore"; and at still another place, "The applicant did not original[ly] state that there was any difference between the types of iron ore and *originally claimed a process generic to all iron ores.*" (Italics supplied by us.)

We do not find any reference to this phase of the controversy in the decision of the board, nor do we find any allegation of error, in the reasons of appeal filed with us, which relates to the finding of lack of difference between the types of iron ore, nor is the finding discussed in the brief for appellant before us.

In the brief of the Solicitor for the Patent Office it is said: "* * * Under these circumstances it would appear that the examiner's statement must be accepted as correct. In re McCabe, 90 F.2d 111, 24 C.C.P.A., Patents, 1224; In re Davis, 123 F.2d 651, 29 C.C.P.A., Patents, 723."

We are in agreement with the view so expressed by the Solicitor.

Before discussing the effect of this holding, however, it is deemed proper to consider some of the other contentions made on behalf of appellant.

It is contended on his behalf that the Lenher disclosure is not properly combinable with the other references on the grounds (as epitomized in the brief of the Solicitor for the Patent Office): "(1) that the patentee does not suggest varying the pH, (2) that the patent does not disclose separating an iron ore from silica by any method, and (3) that the state of the art does not warrant generalizations concerning the functioning of frothers or collectors."

The holding of the board with respect to the subject matter of ground No. 1 has been recited hereinbefore, but we made no ruling upon appellant's allegation that such holding constituted error.

The discussion of the Lenher patent in the brief before us is substantially the same

as that stated by the board to have been presented in the brief before it, quoted *supra,* except that the sentence to which the board "took exception" is not reiterated in the form there stated, but it is recited that Lenher gave three examples and that: "* * * In Example 1, Lenher expressly stated that the pH value of the pulp circuit was to be 'maintained at *about 7.0*' * * * and in each of Examples 2 and 3 Lenher noted that he followed the conditions observed in Example 1, ergo, that the pulp circuit was maintained at about 7.0." (Italics ours.)

It is noted that the Primary Examiner, in his statement following the appeal to the board, said, *inter alia:* "* * * The term 'about' does not set any definite limits on range sought to be established as critical. Innis Speiden & Co. v. Food Machinery Corp., D.C., 49 F.Supp. 722."

Also, in the reply to the brief for appellant filed before the board, it was said: "* * * While the [Lenher] patent shows an example in which the pH was maintained neutral, there is nothing in the patent to limit his process to neutral pulp."

Incidentally it may be said that the symbol "pH" does not seem to have been used in the *claims* of the Lenher patent. Its use actually is referred to in only Example 1 of the specification, but by inference it, perhaps properly, may be considered as being present in Examples 2 and 3, and we have considered it from that standpoint.

In view of the flexibility in meaning of the term "about," however, we are not prepared to accept appellant's insistence that the example given in the Lenher patent of a pH value "maintained at about 7.0" means maintenance at precisely 7. said to be the exact neutrality point.

Another holding closely related to that just discussed was made by the Primary Examiner and recited in his statement following the appeal to the board as follows: "The determination of the most appropriate pH concentration to use with a given flotation agent on a particular ore appears to be only the performance of routine experiment. Such experiments would be obviously made by any worker in the art."

The board after quoting from appellant's brief before it said:

"It is clear from the above excerpts from the appellant's brief that his alleged invention resides in making the pulp circuit distinctly alkaline when using aliphatic amines of the type defined in the claims as collectors. The Examiner holds that this involves no invention because it is well recognized in the prior art that the pH of the pulp has a marked effect upon the effectiveness of cationic flotation agents for separating the components of particular ores and that it is, therefore, a matter of routine investigation rather than invention to determine the optimum pH range for concentrating any given ore with any particular cationic flotation reagent.

"We have given careful consideration to the appellant's arguments, but we find no reversible error in this holding."

It is noted that appealed claims 6 and 9 call for alkalization of the pulp to a pH of from *about* 8 to *about* 10 and claim 10 fixes only a minimum limit of 8. Obviously, appellant himself requires flexibility in the meaning of the term "about." We observe that in the quotation from the Glossary, *supra,* supplied in the brief for appellant, it is said that a pH of between 6 and 7 means "very weakly acidic" while a pH of between 7 and 8 means "very weakly alkaline."

As a matter of possible interest, we insert here a definition of "pH" found in Bennett's "Concise Chemical and Technical Dictionary" published in 1947. It is somewhat more elaborate than that given in appellant's Glossary. "pH. Hydrogen ion concentration, measured as the number of gram molecules of hydrogen ions per liter of solution; generally expressed as the logarithm of its reciprocal, i. e.,

$$pH = \log \frac{1}{[H]^+}$$

"The pH is a measure of acidity and alkalinity, neutrality being at pH 7; pH under seven indicates an acid solution and pH over seven an alkaline solution; the nearer the pH to seven the weaker is the acid or the alkali."

It is a most reasonable supposition that the concentration of some ores of the type defined in the appealed claims requires a "very weakly alkaline" such as one having a pH between 7 and 8 which would be covered by the term "about"; that others require stronger alkalines anywhere "from about 8 to about 10"; while others might require even more than 10—the Glossary seems to teach use of an alkaline having a pH as high as 14. This would seem to be covered by the phrase "in excess of 8" appearing in claim 10.

We do not think it was error to affirm the Primary Examiner's holding to the effect that determination of the pH proper to be used in the concentration of ores, including, of course, the particular ores named in appellant's claims, is a matter of routine investigation rather than one of invention.

The second ground advanced on behalf of appellant as a reason against combining the Lenher disclosure with the other references is stated in his brief as follows: "The Lenher patent does not disclose separating an iron ore from silica by any method."

It is thought that this contention is highly technical and without merit. Certainly Lenher discloses a flotation process for application to a material in which iron oxide and silicate are mingled. The purpose of the flotation process fundamentally is to separate the iron ingredient from other ingredients so that the iron ingredient may become useful in industry.

Hackh's Chemical Dictionary defines "flotation" as follows: "A method of concentrating ores by grinding them with a frother, as oils or acids and separating the differently moistened or wetted mineral particles by floating them upon water, usually agitating the mixture by compressed air. The wet gangue settles out and the concentrated ore is skimmed off."

It would be somewhat difficult, it seems to us, to attribute any particular utility to Lenher's process if it did not work a separation of the ingredients of the raw material to which it is applied. At any rate we do not doubt that separation is necessarily inherent in the process.

The third ground advanced on behalf of appellant as a reason against combining the Lenher disclosure with the secondary references is (as stated in his brief): "The state of the art does not warrant generalizations, or the *a priori* application of knowledge of the functioning of one collector to the functioning of a different collector."

The general principle which we regard as applicable here is well stated, with citation of authorities, in the brief of the Solicitor as follows: "The rule is well established that it is entirely proper to consider a number of references to the prior art in connection with the allowance of patent claims, and that in such cases the question is whether the prior art suggests doing the thing that the appellant has done. In re Stover, 146 F.2d 299, 32 C.C.P.A. Patents, 823; In re Merkle, 150 F.2d 445, 32 C.C.P.A., Patents, 1151; In re Herthel, 156 F.2d 170, 33 C.C.P.A., Patents, 1202. Moreover, the mere fact that no single reference shows the complete combination is of no legal significance. Jungeraen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235."

Appellant's application is in the field of cationic froth flotation utilized in treating certain types of iron-bearing minerals in order to recover the iron for industrial purposes. That field of art was not created by appellant. That he frankly concedes, giving to Lenher the credit of making the "important discovery" of using aliphatic amines as cationic collectors, as hereinbefore has been recited. The Primary Examiner in the performance of his duty made search and found teachings which he regarded as directly pertinent that were made by others than Lenher before appellant entered the field, and he applied those references along with Lenher's teachings—Lenher being the pioneer in the field according to the record before us.

The Primary Examiner's findings of fact relative to what he deemed to be the pertinent features of the secondary references read:

"The Bureau of Mines paper No. 3333 describes experiments with reagents of the

cationic class. It particularly notes that the pH concentration influences the charge and collection on most minerals. It states that the positively charged reagents are in general specifically collectors for silica from non-sulphides. It specifically mentions the flotation of silica from iron ores and gives an example of the separation of silica from Magnetite in which soda ash was added to the pulp. The article also states that test of hematite and martite ores gave flotation of the silica.

"The patent to Trottier [sic] in Example 23 shows the froth flotation of a hematile [sic] ore with a cationic reagent. The patent states, 'In alkaline circuit this reagent was found to have a definite selective action in favor of silica, while on acidifying the pulp the effect was reversed the iron mineral being found to float in preference to the silica.'

"The patent to Harris shows the flotation of various ores with cationic reagents. The patent states, 'again effective separation at a pH of about 7 to 8 can be made with silica from iron ore.'

"The article by Arbiter is directed to the froth flotation of ore with amines. The article states 'The fact that recovery and pH of a flotation pulp are related has been known ever since the early days of froth flotation. Gaudin showed that the optimum pH differs for different collectors and his work suggests a different optimum for different minerals with the same collector. Taggart and Arbiter show that, as far as collection by soaps is concerned, there is a different optimum pH for flotation of each metallic cation, dependent upon the basic character of the cation, and that depression either side of this optimum is proportional to the hydrogen-ion concentration and apparently is due to difference in the degree of ionization of the surface-anchored hydrocarbon compound.

" 'The effects of variation in hydrogen-ion concentration on attachment of air bubbles to amine-conditioned metalliferous particles are indicated in Figures 1, 2 and 3.' "

The board declared that "the secondary references relied on by the Examiner clearly show that the effectiveness of cationic collectors with ores is dependent on the pH concentration of the pulp,[2] and followed this with quotations from each of such references[2] in support of its holding so made which, of course, was in entire harmony with the holding of the Primary Examiner.

We do not deem it necessary to repeat the quotations made by the board from the secondary references. Appellant does not —indeed could not—challenge their accuracy as findings of fact. We regard them as pertinent to the issue before us and proper to be considered along with the Lenher disclosure in determining the "state of the art." We are unable to discern how the actual state of the art of cationic froth flotation could be determined without considering them. Hence, we are of opinion that combining the secondary references with Lenher's disclosure constituted something more than "the *a priori*[3] application of knowledge of the functioning of one

---

**2.** In connection with the matter quoted from the Bureau of Mines publication, which stated, *inter alia*, that "The flotation of silica from soft iron ores that slime readily was more difficult," the board said: "Since no data upon which the above quoted assertions are based are given in this publication, it is difficult for us to evaluate its true significance. It appears to us that it is quite possible that the ores used by the Bureau of Mines investigators slimed too readily."

Appellant filed a petition for reconsideration of the board's decision covering a number of points. An affidavit relating to the board's statement above quoted was filed upon the basis of which the board withdrew the statement but said: "However, since our decision does not depend on the accuracy of the inference upon which this statement was based, the withdrawal of this statement does not materially affect our final decision."

After considering all the points raised by appellant's petition, the board declined to change its original conclusion or to make any change in the decision other than the withdrawal of the quoted statement.

**3.** The definition of the Latin phrase "a priori" given in Black's Law Dictionary is: "From the cause to the effect; from what goes before. A term used in logic

collector to the functioning of a different collector."

Appellant's reasons of appeal embrace 21 separate allegations of error and each of them is discussed in the elaborate and—we may add—closely reasoned (although we are unable to agree to all the reasoning) brief on his behalf. This court is not unmindful of the importance of recovering from low grade ores and materials which were long treated as mining wastes, such minerals as may be used in industry, and we are sympathetic with all efforts looking to such recovery. We have studiously considered appellant's arguments. Many of the assignments of error are incidental in character and while properly included are not material in view of the conclusion which we feel compelled to reach upon the fundamental question which, as we have stated, constitutes the ultimate issue in the case. Therefore, it is unnecessary to prolong this opinion by attempting to follow and reply seriatim to the arguments advanced concerning such assignments.

For the reasons which we have given we are not convinced that the Board of Appeals erred in affirming the rejection of the claims by the Primary Examiner, and its decision is affirmed.

Affirmed.

to denote an argument founded on analogy, or abstract considerations, or one which, positing a general principle or

admitted truth as a cause, proceeds to deduce from it the effects which must necessarily follow."